IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN DIEKMAN | : | CIVIL ACTION |
| Plaintiff | : | |
| v. | : | |
| ENERGY CHOICE MARKETING, INC., ET AL. | : | NO. 02-4681 |
| Defendant | : | |

**NOTICE**

NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

Philadelphia Bar Association
Lawyer Referral and Information Service
1101 Market Street, 11th Floor
Philadelphia, PA 19107-2911
(215) 238-6333

AVISO

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta ascentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATA-MENTE, SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

Asociacion De Licenciados De Filadelfia
Servicio De Referencia E Informacion Legal
1101 Market Street, 11th Floor
Filadelfia, Pennsylvania 19107-2911
Telefono: (215) 238-6333

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN DIEKMAN | : | CIVIL ACTION |
| Plaintiff | : | |
| v. | : | |
| ENERGY CHOICE MARKETING, INC., ET AL. | : | NO. 02-4681 |
| Defendant | : | |

## AMENDED COMPLAINT

_____1. John Diekman ("Diekman") is a resident of the State of New Jersey residing currently at 8200 Boulevard, East North Bergen, New Jersey.

2. Energy Choice Marketing, Inc. ("ECM") is a business entity with its principal place of business at 2200 Michener Street, Suite 11, Philadelphia, PA.

3. Shai Fishman ("Fishman") is the President, Owner and Chief Executive Officer of Energy Choice Marketing and S & D Marketing. He is a citizen of Pennsylvania.

4. S & D Marketing, Inc. is a Pennsylvania Corporation with its principal place of business at 2200 Michener Street, Suite 11, Philadelphia, PA. with offices at 9542A James Street, Philadelphia, PA.

5. During the relevant period of employment, S & D and ECM commingled funds and at all relevant times acted as the alter ego or parent or managing agent of ECM.

6. Consumer Choice, Inc. ("CCI) is the successor in interest to Energy Choice Marketing. It is a Pennsylvania company with its business also at 2200 Michener Street, Suite 11, Philadelphia, PA.

7. On or about January 19, 2001, ECM and Fishman and Diekman entered into an "Executive Employment Agreement" attached hereto as Exhibit "A".

8. As part of the agreement Diekman was given the title and executive responsibilities of "Managing Director" of ECM.

9. Compensation for the position was set at $140,000 per annum payable in bi-weekly installments.

10. In addition to the base salary, Diekman was promised a $2.00 commission on ECM sales.

11. Diekman was promised $245/month payment of health and dental insurance plus $650.00 car allowance, designed to cover both vehicle payments and insurance.

12. Diekman was given 12 round trip flights to a destination of choice not to exceed $6,000 per year.

13. Diekman's contract obligated ECM to a total base compensation package including fringe benefits of $156,240. In addition, Diekman was to receive the commissions on the number of sales generated by ECM's employees.

14. ECM under Diekman was a company that sought to provide customer acquisition marketing services to communication and energy suppliers following deregulation of the transmission and distribution of said utilities.

15. ECM's objectives were to act as a telephone and door to door sales branch on behalf of new energy distributors or transmitters and convert customers from their former utility to a new provider, such as Smart Energy, ECONnergy, TalkAmerica, ServiSense, KeySpan Gas, Z-Tel and others.

16. On or about June 12, 2001 less than six months after being installed as Managing Director of ECM, Mr. Diekman was terminated for "(iv) employees non-performance" under paragraph 8 of the agreement. (See Exhibit "B," June 12, 2001 letter from Shai Fishman, C.E.O. of Energy Choice Marketing to John Diekman).

17. At the time of the termination, Mr. Diekman was scheduled to receive $5,384.52 bi-weekly.

18. At the time of the termination, Mr. Diekman had worked about ten pay periods.

19. Upon information and belief, at the time of the termination, commissions were owed on February net orders totaling in number 8,303.00, March net orders totaling 4,210.00, April net orders totaling 3,812 and May/June orders till termination totaling 3,482.00. Total sales during the time period prior to termination were 19,807 in sales. (See Exhibit "C").

20. In January, Diekman had 10 days worth of Smart Energy business and within his first week there were over 3,800 sales on the display board. The numbers for February may be higher, as the employees were still doing Smart Energy for the first 2-3 weeks though they were trying to cut down because they were not getting paid. The number of total sales during the pre-termination period needs to be discovered based on the invoicing of the clients.

21. Diekman has no information regarding net sales from June 12, 2001 to January 19, 2002, such information must be obtained from discovery.

22. Diekman received partial payments of compensation on 2/28/01, 3/01/01, 3/24/01, 4/23/01, 5/11/01, 6/14/01, and 6/21/01 which totaled $33,000.

23.  At all times relevant hereto, ECM (now CCI) was a start-up business founded in March of 1999 and incorporated separately in January, 2001.

24.  At the time of its incorporation as a separate entity from S & D, Diekman was being asked to get up and running a door to door marketing operation for Fishman, ECM (now CCI) and S & D.  Door to door was an area where ECM (now CCI) was unfamiliar and had no established  track record save a few months here and there with some strengthening of their door-to-door business for about 4 months prior to Diekman's entry.  Diekman had substantial expertise in the field and was hired to get this process on track with new talent and promotion.

25.  It was known prior to ECM, Fishman and S & D that such an undertaking might take some time to develop and might be subject to volatility given a start-up with limited capitalization.

26.  Diekman himself contributed $50,000.00 in cash to increase capital  and acquired a 20% interest in ECM.

27.  Door to door sales vary by weather, by client and by market.  Finding and training effective individuals to generate sales takes time and energy to develop.  This was known to Fishman and ECM.

28.  At the early point in time ECM had only a few clients; Smart Energy, Z-Tel, TalkAmerica and ECOnergy.  Prior to Diekman's arrival, ECM was  taking little or no new business at the time.  Through no fault of Diekman ECM lost Smart Energy not long after he arrived.  As a consequence of this loss, ECOnergy  would  not take business from them. These were the seed clients from which Diekman was expected to grow the business.  These set-backs occurred within the first months following his hire

and were not caused by his non-performance.

29.   ECM attempted to work out of three markets originally: New York, Philadelphia, and Detroit.

30.   Production goals were established sometime in February by Diekman and Fishman and efforts were made by all employees to meet the goals with full knowledge that their goals would not be attainable within the context of a start-up operation.

31.   Production or performance goals were not given to Diekman as a condition of his employment as Managing Director.

32.   Diekman took all reasonable steps to develop the necessary infrastructure, locate talented people and solicit new clients.

33.   Almost from the inception of the agreement, due not to poor performance by Diekman, but because of capital deficits, poor money management, and existing client credit problems, ECM's owner Fishman began deferring payments of salary and commissions resulting in financial hardship to Diekman and interfering with Diekman's efforts to establish ECM as a stand alone organization.

34.   By late February for Smart Energy and through to April 2001, several major clients were withholding substantial payments and causing intense financial pressure to bear on ECM.  Indeed, Smart Energy was roughly 90% of ECM's business and ECM lost this major client during the first 60 days of Diekman's tenure through no fault of Diekman's.

35.   ECM and Fishman, after benefitting from Diekman's efforts, performance and expertise wrongfully terminated him for non-performance without paying him his earned salary and earned commissions.  No excuse has been offered for non-payment

of earned compensation except efforts to leverage a more favorable severance by initially withholding his investment capital for 6 months and continuing to withhold his earned salary and commission.

36.   In addition, the Defendants intentionally terminate  the Employment Agreement to shed liability to Diekman in order to personally benefit ECM and Fishman.  This constituted a breach of fiduciary duty owed by Fishman to his partner Diekman.

37.  The decision to terminate Diekman was not due to non-performance.  To the contrary, the decision was the result of the failure of ECM's owner Fishman to properly capitalize the company and provide reasonable resources to the talented persons in its employ coupled with client payment delays and client contract decisions.

## COUNT I

## <u>BREACH OF EMPLOYMENT CONTRACT</u>

## DIEKMAN v. ENERGY CHOICE MANAGEMENT

## AND CONSUMER CHOICE, INC.

38.   Plaintiff incorporates by reference paragraphs 1-37 as if fully set forth herein at length.

39.  A valid binding contract existed as of January 19, 2001.

40. Based on the above  facts and circumstances, the contract was breached by ECM and Fishman under the pretense of non-performance and such breach was wrongful and in bad faith.

41.  Defendants' conduct was the proximate cause of the breach.

42. Actual consequential and compensatory damages are owed in the following:

a)   All unpaid and earned salary and benefits from January 19 to June 12, 2001 less $33,000.00 and interest on the salary and benefits at the statutory rate.

b)   All unpaid and earned commissions from January 19 to June 12, 2001 along with interest on the earned commissions at the statutory rate.

c)   $117,000 in unpaid salary representing the period June 12, 2001 to January 19, 2002 along with interest at the statutory rate.

d)   Expected commissions from June 12, 2001 to January 19, 2002 at the $2.00 per net sale rate along with interest at the statutory rate.

e)   Attorneys fees and costs.

WHEREFORE, Plaintiff requests damages in excess of $50,000.00 exclusive of interest fees and costs.

## COUNT II

## BREACH OF FIDUCIARY DUTY

### DIEKMAN v. FISHMAN

43.   Plaintiff incorporates by reference paragraphs 1-42 as if fully set forth herein at length.

44.   Fishman asked Diekman to contribute $50,000 to purchase ECM stock and become a 20% owner of Energy Choice Marketing.

45.   Fishman required Diekman to sign a covenant not to compete and act as as Managing Director of ECM.

46.     It was understood that Fishman and his other company S & D would not compete with ECM and divert sales and revenue away from ECM and book them as sales of S & D.

47.     Diekman was terminated as a pretense after Fishman acquired the essential information as to how to set up the door-to-door operation.

48.     Diekman was paid on a commission basis as a part of his compensation package.

49.     Fishman used his company S & D Marketing to divert sales from ECM which would benefit Diekman.

50.     Further, Fishman claimed that Diekman was required to defer salary because of the loss of business when Fishman knew that other clients had been booked with S & D that should have shown up as ECM business.

51.     Fishman and S & D commingled funds that were properly ECM's funds and as a consequence Diekman was deprived of compensation.

52.     Fishman represented that he was losing money from ECM and required Diekman to defer salary when in fact Fishman was taking his salary out of S & D and not accurately representing the condition of ECM to Diekman.

53.     Fishman terminated Diekman and then exercised a contractual option as to repurchase Diekman's stock in June of 2001.

54.     Fishman wrongly used his fiduciary status to attempt to compel Diekman to sign an unfavorable termination agreement.

55.     Fishman knowingly and intentionally refused to tender the $50,000 required to repurchase the shares until March of 2002.

56.    Fishman and Diekman remained partners and Diekman was a minority partner in the year 2001.

57.    Diekman never received the required K-1 for the year 2001.

58.    Diekman's W-2 was inaccurate for the year 2001.

59.    Gross breaches of fiduciary duty occurred throughout the year as the minority shareholder was never provided with any of the proper shareholder material during the year or after the year, including a proper accounting at the end of the year.

60.    Fishman exploited his minority partner, refused to properly compensate him during the first five months of 2001, appropriated his expertise, commingled and ran his salary and expenses through his other company S & D while leaving Diekman to defer or be deprived of his compensation.

61.    Fishman breached fiduciary duties as follows:

a)    commingled the assets of ECM with S & D without properly accounting to the minority shareholder;

b)    diverted sales of ECM to S & D without permission of the minority shareholder and to the detriment of the value of the shares of stock;

c)    deliberately lowered the value of ECM by manipulating the accounting;

d)    exercised a right of repurchase and then refused to tender the share price in an attempt to coerce the minority shareholder into executing a less favorable termination agreement;

e)    failed to provide proper S corporation accounting to the minority

shareholder regarding his beginning and ending    financial

condition; and

f)    actively competed with ECM through diverting sales.

WHEREFORE, Plaintiff John Diekman requests judgment against Fishman.

## COUNT III

## TORTIOUS INTERFERENCE WITH CONTRACT

## DIEKMAN v. S & D

62.    Plaintiff incorporates by reference paragraphs 1-61 as if fully set forth

herein at length.

63.    S & D Marketing was a company owned by Shai Fishman that did

telephone marketing.

64.    S & D was set up as a separate entity from ECM.

65.    Sometime in the early part of 2001, S & D began to book sales of door-to-

door commissions in its ledgers and its officers and directors diverted funds away from

ECM.

66.    S & D competed and interfered with Diekman's ability to perform his job

and grow the door-to-door business.

67.    S & D used confidential and proprietary sales information that was

brought by Diekman to deprive ECM of clients and sales revenue.

68.    As a consequence of S & D's tortious interference and unfair trade practices, Diekman was deprived of salary and commissions and was subsequently terminated for cause.

69.    But for S & D's tortious interference with ECM's business, Diekman would not have been terminated.

70.    But for S & D's management and accounting, Diekman's contract with ECM could have been maintained.

WHEREFORE, Plaintiff John Diekman requests damages for tortious interference.

Dated:  November 14, 2002                    Respectfully submitted,

                                   RYAN, BROWN, McDONNELL,
                                   BERGER & GIBBONS, P.C.


                                   _____
                                   Michael T. McDonnell, III, Esquire

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the AMENDED COMPLAINT on

behalf of Plaintiff John Diekman was made on counsel listed below:

Stephen G. Burns, Esquire
BURNS & KASMEN
The Pavilion, Suite 630
261 Old York Road
Jenkintown, PA 19046

Dated: November 14, 2002          RYAN, BROWN, McDONNELL,
                                  BERGER & GIBBONS, P.C.


By_____
        Michael T. McDonnell, III